GREAT DIVIDE INSURANCE COMPANY,
for itself and on behalf of Aventura Construction
Corporation,

    Plaintiff,

v.

AMERISURE INSURANCE COMPANY and
DRAWDY CONCRETE CONSTRUCTION, LLC,

    Defendants.

## **MEMORANDUM OPINION**

On April 23, 2018, this Court held a one-day bench trial on GREAT DIVIDE INSURANCE COMPANY's ("Great Divide") breach of contract claim against DRAWDY CONCRETE CONSTRUCTION, LLC ("Drawdy"). *See* DE 1 (Count III of the Complaint for Declaratory Relief and Damages). The Court, having otherwise disposed of Great Divide's other claims,[1] issues the following findings of fact and conclusions of law on Great Divide's breach of

---

[1] On March 14, 2018, this Court entered an Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment. *See* DE 86-1. In sum, the Order held that AMERISURE INSURANCE COMPANY ("Amerisure"), Drawdy's insurer, "did not breach its contractual duty to defend or to indemnify when it disclaimed coverage" because Amerisure did not issue insurance for completed operations and that "Drawdy did not have a duty to obtain additional insured insurance for completed operations and, therefore, did not breach the contract due to its failure to secure additional insurance." *Id.* at 10-11.

contract claim against Drawdy for failing to indemnify Aventura Construction Corp. ("Aventura"), Great Divide's insured.[2]

# FINDINGS OF FACT

1. **Master Contract.** Aventura was the general contractor hired by Cumberland Farms, Inc. ("Cumberland Farms") to build a convenience store located in Sebastian, Florida (the "Project"). *See* Master Contract, *Defendant's Exhibit No. 26*. Under the Master Contract, Aventura was responsible for constructing the Project in accordance with drawings, plans, and specifications. *Id.* at 2 ("Scope of Work"). Aventura was not responsible for the design of the Project, and had no inspection responsibilities. *Id*; *see also* Trial Transcript at 19:9-14.[3]

2. **Subcontract.** Aventura subcontracted all of the concrete work to Drawdy, including all work related to A.D.A. ramps and A.D.A. curb ramp flares. *See* Subcontract, *Plaintiff's Exhibit No. 1*; *see also* TT at 20:1-3; 205:17 to 206:6. Pursuant to the Subcontract, Drawdy was required to "[p]rovide all labor, material, equipment, and supervision necessary to perform all CONCRETE work as per plans and specifications." *Exhibit No. 1* at 1. The Subcontract also states that Drawdy is to "[p]rovide/coordinate all inspections as necessary to achieve sign-offs." *Id.*

---

[2] Great Divide has pursued a breach of contract action against Drawdy on behalf of its insured, Aventura, pursuant to an assignment contained in the underlying insurance policy. *See* DE 86 at 6 (rejecting Defendants' standing argument, recognizing that Great Divide's "insurance policy with Aventura includes an assignment of Aventura's rights under the policy to Great Divide" that "states that '[i]f the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us'", and holding that "Aventura transferred its rights to Great Divide, Great Divide has standing, and Defendants … motion for summary judgment as to the issue of standing is denied."); *see also Liberty Mut. Fire Ins. Co. v. Wal-Mart Stores East, LP*, 269 F. Supp. 3d 1254, 1261-62 (M.D. Fla. 2017) (insurer entitled to pursue breach of contract and contractual indemnity claims under an assignment from its insured).

[3] All citations to the Trial Transcript are (TT at Page: Lines.)

3. Referenced and incorporated into the Subcontract were the Project's plans and drawings, including plans and drawings related to a concrete A.D.A. ramp and A.D.A. curb ramp flare located at the outside entrance of the convenience store. *Id.* at 13 (Plan CFG9.1), 15 (Plan A0.4). Under the "DETAIL NOTES", the plans stated that the A.D.A. ramp and A.D.A. curb flare are to be constructed "PER A.D.A. STANDARDS … AND FLORIDA BUILDING CODE STANDARDS". *Id.* at 13 (Plan CFG9.1).

4. The Subcontract also contains an "Indemnification" clause that states that Drawdy "expressly agrees to **indemnify** and **save harmless** Aventura … **from all claims**, demands, **suits, costs or expenses because of bodily injury** … sustained by any person(s) … **arising out of his operations, work or materials** under this Subcontract….." *Id.* (emphasis added).

5. **Underlying Personal Injury Lawsuit.** A little over a month after the Cumberland Farms opened to the public, Bruce Henkle ("Henkle"), a customer, allegedly tripped on a concrete A.D.A. curb flare, fell, and seriously injured himself. DE 86 at 3-4 (the Project was substantially completed on October 7, 2014 and Mr. Henkle allegedly tripped and fell on November 13, 2014); *see also* Complaint, *Plaintiff's Exhibit No. 2*.

6. Mr. Henkle initiated a lawsuit against Cumberland Farms, Aventura, and others.[4] *See* Complaint, *Plaintiff's Exhibit No. 2*. As to the claims against Aventura, Mr. Henkle alleged

---

[4] By way of background, Mr. Henkle initially filed suit against Cumberland Farms only in state court, however, the suit was removed to federal court on June 23, 2016. *See* Case 2:16-cv-14248-DMM, DE 1-1 (alleging that he "tripped and fell over a curb"). On November 4, 2016, Mr. Henkle filed an Amended Complaint that added Aventura, Core States Group, the civil engineer of the Project, and Allevato Architects, the architect of the Project. *See* Case 2:16-cv-14248-DMM, DE 33 (alleging that he "tripped and fell over a 'flared curb" … immediately adjacent to an ADA entrance ramp"); *see also* TT at 18:17-24. Mr. Henkle filed a Second Amended Complaint, which was substantively identical to the Amended Complaint and just corrected the corporate name of Aventura. *See* Case 2:16-cv-14248-DMM, DE 79 ("ENDORSED ORDER" permitting Mr. Henkle to "file a Second Amended Complaint that changes only Defendant Deymeyer Aventura Construction Corp.'s name").

that he "was injured" when he "tripped and fell over a 'flared' curb … located immediately adjacent to an ADA entrance ramp." *Id.* at ¶ 20. He further alleged that Aventura, "through its agents, servants, and/or employees" was negligent "[i]n constructing … the premises in violation of applicable building codes, statutes and ordinances." *Id.* at ¶ 21.[5]

7. In terms of damages, Mr. Henkle claimed to incur over $300,000 in past medical bills and expenses, future medical expenses estimated at over $400,000 (due to the need for future surgeries), and significant pain and suffering damages. *See* TT at 30:22 to 31:2. Overall exposure was estimated to be in excess of one million dollars. *Id.* at 30:16-18.

8. **Liability Theories Advanced In Underlying Personal Injury Lawsuit.** Mr. Henkle retained Ronald Bertone, a licensed architect, to provide expert opinions related to the subject concrete "ADA Curb Ramp" located at the Project. *See* Affidavit of Bertone, *Plaintiff's Exhibit No. 9* at 2 (¶¶ 2-3); *see also* Photographs Identifying the Subject A.D.A. Curb Flare, *Plaintiff's Exhibit No. 8*.[6] According to Mr. Bertone's affidavit and expert report, he offered three expert opinions related to liability. *See* Affidavit of Bertone, *Plaintiff's Exhibit No. 9*.

9. First, the slope of the concrete A.D.A. curb flare "at the location where [Mr. Henkle] tripped and fell … was not uniform" and "exceeded and violated the maximum allowable slope requirement of 10% [as] set forth in Florida's Accessibility Code For Building Construction…." *Id.* at 4 (¶ 4(k)). In support of this opinion, Mr. Bertone took photographs that showed that the concrete A.D.A. curb flare violated A.D.A. Standards and the Florida Building

---

[5] The parties have stipulated that Mr. Henkle "tripped over the curb, in part, because it was not properly constructed." DE 99 at 6 (¶ 5 (e)). It is further undisputed that the concrete A.D.A. ramp and A.D.A. curb flare were constructed by Drawdy pursuant to the Subcontract. *See* Subcontract, *Plaintiff's Exhibit No. 1*; *see also* TT at 48:5-15; 205:17 to 206:15.

[6] Mr. Bertone's affidavit was also filed in the underlying case. *See* Case 2:16-cv-14248-DMM, DE 138-10.

Code. *Id.* at 23-27. Ultimately, Mr. Bertone concluded that the concrete A.D.A. ramp and A.D.A. curb flare contained "multiple violations of the Florida Accessibility Code for Building Construction." *Id.* at 5 (¶ 4(o)).

10. Second, the concrete A.D.A. curb flare was not painted. *Id.* at 3 (¶ 4(g)) ("the top surface of the curb should have been painted 'safety yellow'").

11. Third, the A.D.A. Access Aisle was too wide, painted to be eight feet instead of five feet. *Id.* at 5 (¶ 4(n)).

12. **Aventura Tenders To Drawdy.** On April 13, 2017, approximately three months after first receiving notice of Mr. Henkle's claims, Aventura tendered the defense of the Henkle suit to Drawdy and demanded indemnification from Mr. Henkle's claims. *See* Tender Letter, *Plaintiff's Exhibit No. 6* at 3 ("demand is hereby made upon Drawdy … to defend and indemnify Aventura"); *see also* TT at 54:5-23. The tender letter cited to the "Indemnity" clause of the Subcontract and explained that the request for indemnification was due to the fact that Mr. Henkle's claims arose out of Drawdy's operations and work. *See* Tender Letter, *Plaintiff's Exhibit No. 6* at 2.

13. Drawdy received notice of the tender and was afforded the opportunity to participate in litigation and settlement of the underlying personal liability claim; however, Drawdy never responded and refused to indemnify Aventura in any way. *Id.*; *see also Pre-Trial Stipulation*, ¶ 5(g) (DE 99); TT at 8:20-23; 82:7-14.

14. **Settlement Of Underlying Personal Injury Lawsuit.** On June 29, 2017, Aventura settled the underlying case for $150,000.00,[7] which was paid by Great Divide, who initiated the instant contractual indemnity action to recover the settlement amount paid, and

---

[7] *See* Settlement Agreement, *Defendant's Exhibit No. 32*.

attorneys' fees and costs incurred in defending the underlying action[8] and in prosecuting the instant indemnity suit[9].

15. **Reasonableness Of Settlement.** The parties stipulated to the fact that Aventura's underlying settlement of Mr. Henkle's case in the amount of $150,000 was reasonable. DE 99 at 6 (¶ 5(h)); *see also* TT at 19:22 to 20:19.

16. **Potential Liability.** Frank DeMeyer, the President of Aventura, testified that he worked closely with defense counsel in the underlying personal injury case to understand plaintiff's liability theories, assisted counsel in understanding technical construction issues, and independently analyzed his own company's potential liability. *See* TT at 31:17 to 32:8. In doing so, he reviewed the underlying complaints filed by Mr. Henkle, pleadings and motions filed in the case, orders entered in the case, and the affidavit executed by Mr. Henkle's expert. *Id.* at 26:19 to 28:1; 31:21 to 33:1. He ultimately concluded that Mr. Henkle's claim created significant exposure in excess of one million dollars, and that Mr. Henkle was seeking to hold his company, Aventura, vicariously liable for the allegedly improper work completed by his subcontractor, Drawdy. *Id.* at 27:23 to 28:15; 30:16-18.

17. In terms of Mr. Henkle's liability theories, Mr. DeMeyer testified that the only liability theory advanced by Mr. Henkle in the underlying personal injury case that created the potential for liability to be placed on his company, Aventura, was Mr. Henkle's claim that the concrete A.D.A. curb flare "at the location where [Mr. Henkle] tripped and fell … was not

---

[8] The costs and expenses incurred in defending the underlying action totaled $80,169.43. *See* Defense Invoices, *Plaintiff's Exhibit No. 16*; *see also* Answers to Interrogatories, *Defendants Exhibit No. 29*; *see also* TT at 81:15-22.

[9] The issue of Great Divide's entitlement to attorneys' fees and costs incurred in prosecuting the instant indemnity suit was not before the Court at the bench trial and, if claimed, would be the subject of post-trial motions.

uniform" and "exceeded and violated the maximum allowable slope requirement of 10% [as] set forth in Florida's Accessibility Code For Building Construction…." TT at 41:19 to 43:25; *see also* Affidavit of Bertone, *Plaintiff's Exhibit No. 9* at 4 (¶ 4(k)). He further testified that the evidence gathered and submitted by Mr. Henkle's expert was significant and compelling in that it included photographs that depicted violations of A.D.A. Standards and the Florida Building Code.[10] *See* TT at 61:9-15; *see also* Affidavit of Bertone, *Plaintiff's Exhibit No. 9* at 23-27.

18. As for Mr. Henkle's other liability theories, Mr. DeMeyer testified that they did not create the potential for liability to be placed on his company, Aventura. *See* TT at 53:11-24.

19. With respect to the A.D.A. curb flare not being painted, Mr. DeMeyer explained that the painting of the A.D.A. curb flare was not included in Aventura's scope of work as set forth in the Master Contract, that the plans and drawings did not state that painting was required, and that the concrete A.D.A. curb flare was not required to be painted under the A.D.A. Standards or the Florida Building Code. TT at 49:24 to 51:4. In other words, the work was completed according to the plans and drawings and complied with the A.D.A. Standards and the Florida Building Code. *Id.* at 50:11 to 51:4. As such, this liability theory did not create the potential for liability to be placed on Aventura.[11] *Id.* at 53:16-18. Drawdy did not put forth any evidence to contradict this assertion.

---

[10] It should also be noted that Aventura's own liability expert in the underlying personal injury action confirmed that Mr. Henkle's expert correctly measured the slope of the concrete A.D.A. curb flare and admitted that the slopes were greater than 10%. *See* MC Report, *Defendant's Exhibit No. 31* at 7 ("MC's measurements were consistent with those contained within the Robson Report"). The best Aventura's expert could opine is that the slopes were "within construction tolerances". *Id.*

[11] According to Mr. DeMeyer, the design decision to not paint the curb could have created the potential for liability to be placed on the designer of the Project, however, Aventura had no design responsibilities under the Master Contract. *See* TT at 50:11-16; 198:19 to 199:2.

20. With respect to the A.D.A. Access Aisle being "too wide", painted to be eight feet instead of five feet, Mr. DeMeyer explained that the painting of the A.D.A. Access Aisle was included in Aventura's scope of work as set forth in the Master Contract. TT at 51:5 to 53:10. However, he demonstrated that plans and drawing provided by Cumberland Farms stated that the A.D.A. Access Aisle was to be eight feet wide. *Id*. at 51:25 to 52:5; *see also* Subcontract, *Plaintiff's Exhibit No. 1* at 12 (Plan CFG4.0). Mr. DeMeyer explained that although the standard notes on the plans mention a five-foot A.D.A. Access Aisle, a five-foot width is a minimum requirement under the A.D.A. Standards and that the width noted in the actual plans and drawings would govern construction. TT at 52:10-17. Even more, he explained that the parking space located next to the A.D.A. Access Aisle was a twelve-foot-wide "van-accessible parking space" and that under A.D.A. Standard 502.2, an eight-foot A.D.A. Access Aisle is required when adjacent to a "van-accessible parking space". *Id.* at 51:16-24. In other words, the work was completed according to the plans and drawings and complied with the A.D.A. Standards and the Florida Building Code. *Id.* at 53:3-10. As such, this liability theory did not create the potential for liability to be placed on Aventura. *Id.* at 53:22-24. Drawdy did not put forth any evidence to contradict this assertion.

21. There was also no evidence put forth that Mr. Henkle's claims arose out of Aventura's actions or inactions, nor was there any evidence that Aventura's independent actions or inactions created the potential for liability in the underlying case. TT at 123:3-15. In fact, the evidence put forth by Aventura demonstrated that when independent inspectors identified slope issues with the concrete A.D.A. ramp and A.D.A. curb flare, Aventura immediately put Drawdy on notice of the issue and requested that they remedy any issues before the Project would be opened to the public. *See* Punchlist E-Mail, *Plaintiff's Exhibit No. 11* (inspector's issuance of

punchlist to Aventura, which states in relevant part, "The curb ramp appears to be non-ADA complaint."); Punchlist Letter, *Plaintiff's Exhibit No. 3*;[12] Punchlist Request to Drawdy, *Plaintiff's Exhibit No. 4* (Aventura's request that Drawdy complete all punchlist items); *see also* TT at 71:22 to 72:10; 179:7-14. In response, Drawdy advised Aventura that the concrete A.D.A. ramp and A.D.A. curb flare issues were resolved and issued a warranty to Aventura. *See* Warranty, *Plaintiff's Exhibit No. 5*; *see also* TT at 74:16-22; 182:2-16.

## **CONCLUSIONS OF LAW**

"[W]hen a settlement is paid, the party seeking indemnification has the burden to show that the settlement, or portions thereof, fell within the coverage of the indemnity clause." *Bankers Ins. Co. v. Am. Team Managers, Inc.*, 2012 WL 2179117, at *6 (M.D. Fla. June 13, 2012) (citing *Metro. Dade County v. Florida Aviation Fueling Co., Inc.*, 578 So. 2d 296, 298 (Fla. 3d DCA 1991)). In such a case, "the indemnitee is entitled to indemnity upon proof of its potential liability to the original plaintiff and the reasonableness of the settlement." *Id.* at *9; *see also Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1079 (Fla. 5th DCA 2003) ("courts generally agree that a party seeking indemnification must establish that the settlement was made based on his potential liability to the plaintiff."). Accordingly, "[t]he indemnitee may settle for a reasonable amount and then recover that amount from the indemnitor by showing it was not liable on any theory outside the indemnity agreement and was potentially liable on a theory covered by the agreement." *Id.* at 1080.

---

[12] This punchlist explicitly referenced issues with both the concrete A.D.A. ramp and the concrete A.D.A. curb flares: "ADA ramp at primary entrance exceeds maximum allowable path of travel slope. Observed 8.6 to 9 percent slopes, **confirm flares meet maximum allowable slopes, provide compliant slopes**." (emphasis added).

**I.     The Indemnity Clause At Issue – Scope Of Coverage**

"In Florida, courts construe indemnity contracts according to ordinary rules of contract construction." *Fid. & Guar. Ins. Co. v. Ford Motor Co.*, 707 F. Supp. 2d 1300, 1313 (M.D. Fla. 2010). The intent of the parties and the scope of the indemnification provision are derived from the language of the contract and the circumstances in which it was made. *Id*. The duty to indemnify must be measured by the facts developed through discovery taken in the underlying action. *Farrer v. U.S. Fid. & Guar. Co.*, 809 So. 2d 85, 88 (Fla. 4th DCA 2002).

The "Indemnification" clause of the Subcontract that states that Drawdy "expressly agrees to **<u>indemnify</u> and <u>save harmless</u> Aventura** … **from all claims**, demands, **suits, costs or expenses because of bodily injury** … sustained by any person(s) … **<u>arising out of his operations, work or materials</u> under this Subcontract**….." *See* <u>Findings of Fact</u> at ¶ 4. (emphasis added). Accordingly, Drawdy is contractually required to indemnify Aventura from all bodily injury claims or suits "arising out of [its] operations, work, or materials…." *Id*.

The contractual use of the term "arising out of" has been extensively analyzed by the courts. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532-546 (Fla. 2005) (analyzing the contractual construction of this term in Florida and throughout the country). In sum, the term is "not ambiguous and should be interpreted broadly." *Florida. HC Waterford Properties, LLC v. Mt. Hawley Ins. Co.*, 2009 WL 2600431, at *6 (S.D. Fla. Aug. 21, 2009); *James River Ins. Co. v. Ground Down Eng'g., Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008); *see also Gen. Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 451 n. 6 (E.D. N.Y. 2015). In interpreting the term "arising out of", courts have held that the term is broader in meaning than the terms "caused by" or "as a result of" and are understood to be "very broad, general, and comprehensive" terms that mean "originating from," "incident to," "having its origin in,"

"growing out of," "flowing from," or "having connection with." *Taurus Holdings, Inc.*, 913 So. 2d at 539; *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011); *see also Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 6 A.D.3d 788, 790 (2004); *Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157 (2005); *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, 2013 WL 3389008, at *4 (S.D. N.Y. July 3, 2013).

Moreover, courts have broadly construed the term "arising out of" in an "indemnity analysis" to find that an obligation to indemnify exists. *See Natco, L.P. v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1194 (11th Cir. 2001) ("The phrase 'arising out of, or in any way contributed to' clearly evidences an intent that the indemnification provision be construed broadly.") *see also Mut. Employees Trademart, Inc. v. Armour Service of Fla., Inc.*, 170 So.2d 64, 65 (Fla. 3d DCA 1964) (finding that indemnitee's potential liability arose out of indemnitor's operations).

Here, Drawdy's obligation to indemnify Aventura was triggered by Mr. Henkle's claim that he was injured when he tripped and fell on work completed by Drawdy because this was a "claim" of "bodily injury … arising out of" Drawdy's "operations, work or materials".[13] Specifically, in the underlying case, Mr. Henkle alleged that he tripped on work completed by Drawdy. Even more, Mr. Henkle advanced a substantive liability theory that Drawdy's work was defective and caused him to trip and fall. *See* <u>Findings of Fact</u> at ¶ 8; *see also Farrer*, 809 So. 2d at 88 (holding that the duty to indemnify must be measured by the facts developed through discovery taken in the underlying action).

---

[13] Here, Mr. Henkle alleged that Aventura, "through its agents, servants, and/or employees" was negligent "[i]n constructing … the premises in violation of applicable building codes, statutes and ordinances." *See* <u>Findings of Fact</u> at ¶ 6. Such an allegation includes potential claims for Aventura's direct negligence, but also its vicarious liability for Drawdy's negligence. *Metro. Dade County v. CBM Indus. of Minnesota, Inc.*, 776 So. 2d 937, 939 (Fla. 3d DCA 2000).

In order to prove that Mr. Henkle's claim falls within the scope of the Subcontract's "Indemnity" clause, Great Divide does not need to actually prove that Drawdy's work was defective or otherwise improper. 14 Am. Jur. Pl. & Pr. Forms Indemnity § 2 ("In an action to recover indemnity under an express contract, the burden is on the indemnitee to prove that the liability f**or which he or she has been charged** is within the scope of the agreement."). That is not a requirement under the law, nor is it a requirement contained in the "Indemnity" clause. *Misener Marine Constr. Co. v. Southport Marine, Inc.*, 377 So.2d 757, 758 (Fla. 2d DCA 1979) ("In interpreting an indemnity agreement, courts are to look to 'the logical meaning and intent of the contract.'") (citations omitted).[14] Instead, Great Divide need only prove that the claim arose out of Drawdy's "operations, work or materials", which is supported by the evidence put forth at the bench trial[15] and the parties' stipulations.[16] Even Drawdy acknowledges that it must indemnify Aventura if "bodily injury arises out of its operations or materials." *See* TT at 221:24 to 222:4 ("There has to be proof, and the plaintiff has the burden of proof to establish that there was a failure to follow and carry out the subcontract or any act or omission by Drawdy, **or that there was bodily injury arising out of the operation, work, or materials of Drawdy**.") (emphasis added); DE 138 at 9, ¶ 9.

---

[14] To the extent Drawdy relies on authorities addressing common law indemnity, they are inapplicable, as the terms of the contract will govern the scope of Drawdy's indemnity obligations, not common law principles. *See, e.g., GAB Bus. Svcs., Inc. v. Syndicate 627*, 809 F.2d 755 (11th Cir. 1987) (suit for common law indemnity between agent and principal); *Amisub of Fla., Inc. v. Billington*, 560 So. 2d 1271 (Fla. 3d DCA 1990) (common law indemnity claim).

[15] It is undisputed that the concrete A.D.A. ramp and A.D.A. curb flare were constructed by Drawdy pursuant to the Subcontract. *See* Findings of Fact at ¶ 2. It is further undisputed that Mr. Henkle put forth a substantive claim that Drawdy's improper work caused him to fall and injure himself. *See* Findings of Fact at ¶ 8.

[16] The parties have stipulated that Mr. Henkle "tripped over the curb, in part, because it was not properly constructed." *See* Findings of Fact at ¶ 6, n.5.

**II.    The Extent To Which Drawdy Must Indemnify Aventura**

Because the underlying personal injury claim was resolved via settlement,[17] Great Divide need only establish that the settlement, or portions thereof, fall within the ambit of the indemnity clause. *See Metro Dade Cty v. Fla. Aviation Fueling Co., Inc.*, 578 So. 2d 296, 298 (Fla. 3d DCA 1991). Further, in terms of the burden of proof,[18] Great Divide need only prove that Drawdy's allegedly improper work, as claimed by Mr. Henkle, created the "potential for liability" to be placed on Aventura. *Camp, Dresser & McKee, Inc.*, 853 So. 2d at 1080 ("The issue as to whether an indemnitee must establish 'actual liability' to the plaintiff or only 'potential liability' based notice given to the indemnitor is a question for the court to decide.") (citations omitted). "Only if the indemnitor is not given notice and an opportunity to assume responsibility for the claim must the settling indemnitee show that it was actually liable to the plaintiff." *Id*. Since Drawdy was given notice and an opportunity to assume responsibility for the claim, only a showing of potential liability is required. *See Liberty Mut. Ins. Co. v. Byerly*, 299 F. Supp. 213, 216-17 (E.D. Wisc. 1969) (notice to indemnitor three months before trial was considered sufficient notice);

---

[17] Under the "vouching in rule", "an indemnitor who has notice of the suit filed against the indemnitee by the injured party and who is afforded an opportunity to appear and defend it is bound" by the settlement of the underlying claim. *Camp, Dresser & McKee, Inc.*, 853 So. 2d at 1079. Here, the Court has found that Drawdy had notice of the Henkle lawsuit and that it was afforded an opportunity to participate in the litigation and settle the underlying claim. *See* Findings of Fact at ¶¶ 12-13. It refused to do so. *Id.* at ¶ 13. Accordingly, it cannot now challenge the settlement. *Camp, Dresser & McKee, Inc.*, 853 So. 2d at 1079. Additionally, the Court notes that the parties stipulated to the reasonableness of the settlement that Aventura reached with Mr. Henkle. *See* Findings of Fact at ¶ 15.

[18] To be clear, Plaintiff "has the burden of proving their breach of contract claim by a preponderance of the evidence". *Ulloa v. Fancy Farms, Inc.*, 285 F. Supp. 3d 1326, 1336 (M.D. Fla. 2018). However, that is the evidentiary burden that is in turn applied to Plaintiff's burden of proving "potential liability." In other words, Plaintiff must prove, by a preponderance of the evidence, the extent to which Drawdy's allegedly improper work, as claimed by Mr. Henkle, created the potential for liability to be placed on Aventura.

*Acceptance Ins. Co. v. SDC, Inc.*, 952 F. Supp. 644, 647 (E.D. Mo. 1997) (tender of claim to indemnitor one month before trial was sufficient notice).[19]

Accordingly, the issue before the Court is to what extent[20] Drawdy's allegedly improper work, as claimed by Mr. Henkle, created the potential for liability to be placed on Aventura, not whether Drawdy was actually negligent[21] or if the subject concrete A.D.A. curb flare did, in fact,

---

[19] Drawdy contends that it was not given sufficient notice of the settlement itself, citing *GAB Bus. Svcs., Inc.*, 809 F.2d at 755. Aside from the fact that Drawdy never objected to the settlement, or that *GAB* did not involve an indemnity claim based on a written instrument, the authorities the Eleventh Circuit relied on clearly held that an indemnitee that provides notice of the settlement **_or_** provides an opportunity to assume control of the claim, need only establish its potential liability. *GAB*, 809 F.2d at 760-61, n.8 (citing *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296, 304–05 (5th Cir. 1973) and *Burke v. Ripp*, 619 F.2d 354, 357 (5th Cir. 1980)). Drawdy did not dispute receiving notice of the lawsuit and demand for indemnification several months before the case ultimately settled and, if fact, admitted that they received notice of the lawsuit and the demand, investigated the issues, and even contacted their insurance carrier. *See* TT at 186:6-15:

> Q. Well, we issued a tender letter in this case. You received that, correct?
>
> A. I turned them over. Whatever pictures I have, I have given them. We did an as-built of it because we got served with these papers, so we were trying to see what was wrong with it.
>
> Q. Sure, sure. And so when you got served with these papers and there was allegations that your company did something wrong, did you give those photographs to your lawyers?
>
> A. I have turned over all of my pieces of paper.

[20] It is jurisprudential law that a contractual indemnity clause can serve to protect the indemnitee on the basis of comparative indemnification – requiring a proportional or partial indemnification. 41 Am. Jur. 2d Indemnity § 19 (citing *Delle Donne & Associates, LLP v. Millar Elevator Serv. Co.*, 840 A.2d 1244, 1253 (Del. 2004) (holding that the trial court properly awarded "proportional" or "partial indemnity"). Courts typically refer to this type of indemnification clause as a "comparative indemnity clause". Here, as discussed above, the allocation is based upon the extent to which Drawdy's allegedly improper work created the potential for liability to be placed on Aventura.

[21] The Court anticipated that, at trial, Drawdy would argue that any negligence associated with the construction of the curb originated from *Aventura*—not Drawdy—because if Aventura were negligent it would be precluded, under Florida law, from recovery in this case. *See* Fla. Stat. § 725.06. The Court's anticipation was premised on the basis for the Court's denial of summary

violate A.D.A. Standards or the Florida Building Code. *Camp, Dresser & McKee, Inc.*, 853 So. 2d at 1079-80 ("a party seeking indemnification must establish that the settlement was made *based on his **potential liability to the plaintiff***") (emphasis added); *see also Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 304 (5th Cir. 1973) (holding that "proof of actual liability" in the underlying case is not required). As the *Parfait* Court explained, the burden of only proving potential liability avoids the "awkward possibility of having to prove the original plaintiff's case against himself, the original defendant". *Parfait*, 484 F.2d at 304-305.

Here, the underlying plaintiff put forth three theories of liability.[22] *See* Findings of Fact at ¶¶ 9-11. At the bench trial, Aventura established that the only liability theory that created the potential for liability to be placed on Aventura was Mr. Henkle's claim that the A.D.A. curb flare, which was constructed by Drawdy, "was not uniform" at the "location where [Mr. Henkle] tripped and fell", and "exceeded and violated the maximum allowable slope requirement of 10% [as] set forth in Florida's Accessibility Code For Building Construction…." *See* Findings of Fact at ¶ 17.[23]

---

judgment in Plaintiff's favor on this issue—the Court identified a dispute of fact pertaining to whether Aventura's construction at other areas of the site caused Drawdy to make certain alterations to the curb. DE 86 at 12-13. Nonetheless, Drawdy made it very clear to the Court, at the conclusion of trial, that it was not arguing that Aventura was negligent. DE 128 at 230. ("We are not arguing that Aventura was negligent.").

[22] At the bench trial, the only evidence put forth established the existence of three liability theories advanced in the underlying personal injury case. Drawdy did not dispute the existence of these liability theories, and did not put forth any evidence of other liability theories.

[23] Frank DeMeyer testified that Aventura's decision to settle was based on the potential liability Aventura faced as result of Drawdy's work:

> Q. And so ultimately, you ended up settling this lawsuit as to Plaintiff's claims against Aventura?
> A. Yes.
> Q. And that was because of the potential liability that your company faced as a result of Drawdy's work?

In response, Drawdy put forth no evidence to show that other liability theories, independent of the theory arising out of its own work, created the potential for liability to be placed on Aventura. Instead, Drawdy argued that Aventura was required to prove that Drawdy was actually negligent and failed to construct the concrete A.D.A. ramp and A.D.A. curb ramp flare located at the outside entrance of the convenience store in accordance with A.D.A. Standards and the Florida Building Code Standards. *See* TT at 222:5 to 223:3.[24] However, that is not the applicable burden in this case as Aventura was only required to prove potential liability. Further, Drawdy's reliance on the underlying trial verdict is of no significance. The only question answered by the jury was that *Cumberland Farms* was not negligent. There is nothing in this trial record to suggest that the jury found Henkle responsible for his own injuries, or that Aventura was not negligent. The transcript of the underlying trial was not introduced as evidence in this case and the Court cannot speculate as to what evidence the jury considered in reaching its verdict.

---

   A. Yes.

TT at 77:10-15.

[24] After objecting to the introduction of Aventura's expert report on hearsay grounds, Drawdy now attempts to rely on that report to argue that Aventura's expert found the curb flare to be in compliance. *See* DE 138 at 3, ¶ 15. To the extent Drawdy now relies on the report for its truth, then both experts' reports concluding that the curbs exceeded the Florida Building Code and A.D.A. maximum standards, including Bertone's Affidavit and Aventura's own expert (*See* MC Report, *Defendant's Exhibit No. 31* at 7 ("MC's measurements were consistent with those contained within the Robson Report"), show evidence of actual negligence.

Further, even if Drawdy contends that Aventura had an obligation to construct the A.D.A. ramp and A.D.A. flared curbs in accordance with applicable building codes and A.D.A. standards, it is undisputed that such work was solely contracted to Drawdy. <u>TT</u> 146:19 to 147:5[25]

Since the record establishes that the only liability theory that created the potential for liability to be placed on Aventura was Mr. Henkle's claim that the work completed by Drawdy was improper, Great Divide is entitled to the full recovery of the $150,000 settlement.[26]

## III. Great Divide Is Entitled To Reimbursement Of Its Defense Costs And Expenses

The "Indemnification" clause of the Subcontract that states that Drawdy "expressly agrees to **<u>indemnify</u> and <u>save harmless</u> Aventura** … **from all claims**, demands, **suits, <u>costs or expenses</u> because of bodily injury** … sustained by any person(s) … **arising out of his operations, work or materials under this Subcontract**….." *See* <u>Subcontract</u>, *Plaintiff's Exhibit No. 1* at 3 (emphasis added). Additionally, Florida law has long recognized that "an indemnitee is entitled to recover, as part of the damages, **reasonable attorney's fees, and reasonable and proper legal costs and expenses**, which he is compelled to pay as a result of suits by or against

---

[25]     Q. When you subcontract work out to a subcontractor, you assume that they are going to do that work according to the plans and specifications that they need to abide by in accordance with the Florida Building Code and ADA codes, correct?
A. Yes; in this case Florida Building Codes.
Q. And you rely on these subcontractors to do their work properly.
A. Yes.
Q. And in this case, you relied on you Drawdy to do their work properly, correct?
A. Yes.

[26] The Court similarly rejects Drawdy's argument that Great Divide cannot recover defense costs it paid. The authorities relied on by Drawdy are inapplicable, because they did not involve an indemnification provision between two parties. *See Cont'l Cas. Co. v. City of S. Daytona*, 807 So. 2d 91, 93 (Fla. 5th DCA 2002) (general rule that insurer may not recover defense costs does not apply where the risk was transferred to another by an indemnity provision in the contract). Moreover, the authorities relied on by Drawdy only apply when an insurer seeks to recover defense costs from another co-insurer. Drawdy, however, is not an insurer. *See*, *e.g.*, *Camp, Dresser & McKee, Inc.*, 853 So. 2d at 1073 (contractual indemnity action was brought by indemnitee, **<u>and</u>** its insurer) (emphasis added).

him in reference to the matter against which he is indemnified." *Fountainbleau Hotel Corp. v. Postol*, 142 So. 2d 299, 300 (Fla. 2d DCA 1962) (emphasis added). Further since the indemnity agreement includes a "hold harmless" provision, Drawdy is obligated to reimburse Aventura's defense costs. *See*, *Shannon v. Kaiser Aluminum & Chemical Corp.*, 749 F.2d 689, 690-91 (11th Cir. 1985) ("Under Florida law, the general rule is that an indemnitee under an indemnification agreement is entitled to recover reasonable attorney's fees and legal costs which he is compelled to pay as a result of suits brought against him relating to matters for which he is entitled to be indemnified. … This rule is equally applicable whether the indemnitee is successful in his defense of the suit or not.") (citations omitted); *Miller & Co. of Birmingham, Inc. v. Louisville & Nashville R.R. Co.*, 328 F.2d 73, 78 (5th Cir. 1964) ("holding that a hold harmless provision obligates indemnitor to reimburse the indemnitee's defense costs).

Here, the costs and expenses incurred by Great Divide in defending the underlying action totaled $80,169.43. *See* <u>Defense Invoices</u>, *Plaintiff's Exhibit No. 16*; *see also* <u>Answers to Interrogatories</u>, *Defendants Exhibit No. 29*; *see also* <u>TT</u> at 81:15-22. At the bench trial, Defendant argued that Plaintiff had not met its burden in proving that the defense costs were reasonable and claimed that Plaintiff was required to hire an expert to offer an expert opinion on the "reasonableness" of the costs and expenses. *See* <u>TT</u> at 224:13-23. However, Plaintiff has not yet moved for the award of fees and costs in the instant action.[27] Instead, Plaintiff is requesting the award of "costs and expenses" incurred in defending the underlying personal injury lawsuit pursuant to the "Indemnification" clause contained in the Subcontract. As such, this is an

---

[27] It should be also be noted that in a fee application, "[t]he court ... is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value." *Holman v. Student Loan Xpress, Inc.*, 778 F. Supp. 2d 1306, 1310 (M.D. Fla. 2011) (citing *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).

element of damages Plaintiff is seeking to recover and, therefore, independent expert testimony was not required regarding the reasonableness of costs and expenses. *Sea World of Florida, Inc. v. Ace Am. Ins. Companies, Inc.*, 28 So. 3d 158, 160 (Fla. 5th DCA 2010) ("this case involves a situation where [the plaintiff] was seeking to recover previously incurred attorney's fees as an element of damages in a breach of contract action. As such, [the plaintiff's] burden of proof was that which is required in a breach of contract action—the presentation of evidence "sufficient to satisfy the mind of a prudent, impartial person" as to the amount of awardable damages. That is, there must be a reasonable basis in the evidence for the amount awarded…. Although [the plaintiff] was entitled to call an independent expert witness to corroborate the reasonableness of [the] fees, it was not required to do so.") (internal citations and quotations omitted).

Other than argument by Defendant's counsel, there is no evidence in the record that the rates charged, hours billed, or related costs are inappropriate, invalid, or otherwise unreasonable. Further, based upon a review of the evidence submitted by Plaintiff, this Court has concluded that the hourly rates[28], hours billed[29], and related costs[30] are "sufficient to satisfy the mind of a

---

[28] The hourly rates charged by the underlying defense range from $90 to $165 per hour, $90 for paralegal work, $150 for associate work, and $165 for partner work. *See* Defense Invoices, *Plaintiff's Exhibit No. 16* at 1, 43, 107. The Court notes that these rates are well within, if not substantially less, than the current market rates recognized by courts. *See e.g. MKT Reps. S.A. de C. V v. Standard Chartered Bank Int'l*, No.10-22963-CIV, 2013 WL 1289261 at *8-9 (Mar. 28, 2013) (awarding partners between $350-$500 per hour, associates $250 per hour, and paralegals $125 per hour); *Hermosilla v. Coca-Cola Company*, No. 10-21418-CIV, 2011 WL 9364952, *12 (July 15, 2011) (awarding partners $425 per hour, associates $225 per hour, and paralegals $125 per hour).

[29] The hours billed by the underlying defense also appear to be reasonable in light of the fact that this case was litigated by the firm in federal court for over six month: 56.10 partner hours, 260.10 associate hours, 42.00 paralegal hours. *See* Defense Invoices, *Plaintiff's Exhibit No. 16* at 1, 43, 107.

[30] The other costs and expenses incurred also appear to be reasonable, totaling $28,117.93. *See* Defense Invoices, *Plaintiff's Exhibit No. 16* at 2-10, 126-138. Notably, this includes the cost of retaining an expert to defend against the underlying plaintiff's A.D.A. and Florida Building Code

prudent, impartial person" as to the amount of awardable damages, especially in light of the fact that all invoices were actually paid and incurred by Great Divide. Accordingly, pursuant to the "Indemnification" clause, and consistent with Florida law, Great Divide is entitled to the full recovery of the costs and expenses incurred in defending the underlying action.

## CONCLUSION

It is **ORDERED AND ADJUDGED** that Judgment is entered in favor of Great Divide Insurance Company. The Court will determine the monetary amount of this judgment upon separate motion by Plaintiff as Plaintiff has not clearly provided record support for the total amount sought. Plaintiff shall file a motion on damages within seven (7) days of the date of rendition of this Order which contains detailed calculations, together with citations to the record. The Clerk of the Court shall **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 18th day of May, 2018.

_____
Robin L. Rosenberg
United States District Judge

Copies furnished to all counsel of record.

---

violation claims, which totaled $15,791.90. *Id.* at 2-4, 126-129; *see also* Aventura's Expert Report, *Defendant's Exhibit No. 31*.